UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY RAY MINOR,<br><br>Defendant. | No. 1:22-cr-00177-ADA-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS<br><br>(ECF No. 43) |

**I.**

**Procedural Background**

On June 23, 2022, the United States filed an indictment against Mr. Minor and his co-defendant, Tilisha Morrison. (ECF No. 8.) As it pertains to Mr. Minor, the indictment alleges (1) a conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and (2) a conspiracy to provide contraband in prison and to commit identity theft in violation of 18 U.S.C. § 371. (*Id.* at 1, 3.) On July 5, 2022, Mr. Minor entered a plea of not guilty. (*See* ECF No. 17.) He filed the instant motion to dismiss on October 26, 2022. (ECF No. 43.) The government filed its opposition on November 18, 2022, and Mr. Minor replied on December 2, 2012. (ECF Nos. 53, 56.) On December 19, 2022, the Court held a hearing on the motion. (ECF No. 62.) Griffin Estes appeared for Mr. Minor and Jessica Massey appeared for the United States. (*Id.*) This order follows.

## II.

## Factual Background

Between October 2021 and January 2022, Special Investigative Services ("SIS") at the United States Penitentiary in Atwater, California ("USP-Atwater") intercepted two packages containing suspected controlled substances.[1] (ECF No. 53 at 1.) Each of the packages was falsely labeled as "Legal Mail" from Federal Defender offices. (*Id.* at 2.) The first package arrived on October 23, 2021, and the second on December 4, 2021. (ECF No. 43 at 4.) SIS staff inspected the first package on October 26, 2021 and the second on December 7, 2021. (ECF No. 53 at 1.) During a subsequent investigation, SIS staff determined that Mr. Minor and Ms. Morrison had arranged for the delivery of the packages using the USP-Atwater inmate telephone and email system. (*Id.* at 3.) A member of SIS, Gerardo Perez reviewed the correspondence between Mr. Minor and Ms. Morrison, identifying ten separate telephone numbers that the pair used to communicate during the course of their alleged conspiracy. (*Id.*) Officer Perez listened to most, but not all, of the phone calls between the co-defendants. (*Id.*) While reviewing calls made around the time of the December 4, 2021 package delivery, Officer Perez determined that Mr. Minor and Ms. Morrison were using coded language related to Ms. Morrison's clothes sewing business to conceal their alleged criminal activity. (*Id.*) Specifically, the government identified the term "old girl" as a coded word for a package containing drugs. (ECF No. 43 at 6.)

Mr. Minor's motion concerns the package that arrived at USP-Atwater on October 23, 2021. Officer Perez listened to 13 of 21 calls in the time period leading up to that delivery. (ECF No. 53 at 3.) All of those calls used the phone number 214-308-2990. (*Id.*) Officer Perez determined that two of the calls were relevant. (*Id.* at 4.) Neither call used coded language. (*Id.*) Mr. Minor, however, points to an October 23, 2021 call as particularly relevant. (ECF No. 43 at 5.) Officer Perez's contemporaneous notes indicate that, on that call, Mr. Minor and Ms. Morrison discussed a package that was supposed to arrive on October 25, 2021. (*Id.*)

///

---

[1] SIS intercepted a third package on January 1, 2022, but the parties now agree that this package contained no contraband. (ECF No. 43 at 4; ECF No. 53 at 2 n.1.)

During his investigation, Officer Perez preserved a total of 183 phone calls to various phone numbers in the event of future criminal charges. (Perez Decl. ¶ 11.) He did not, however, preserve the 21 calls associated with the 214-308-2990 phone number, including the October 23, 2021 call. (*Id.*) Pursuant to the Bureau of Prisons' inmate telephone system policy, those calls were automatically deleted 180 days after they occurred and before the government filed formal charges against Mr. Minor. (*Id.* at 4.) Officer Perez contends that he thought he had preserved the calls to 214-308-2990 and that his failure to do so was an oversight. (Perez Decl. ¶¶ 11–12.)

### III.

### Legal Standard

The Due Process Clauses of the Fifth and Fourteenth Amendments compel the government to provide potentially exculpatory evidence to criminal defendants. *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). When the government destroys or fails to preserve such evidence, vindicating the defendant's rights requires a court to either dismiss the case or suppress any secondary evidence the government derived from the destroyed evidence. *Id.* at 486–87; *see also United States v. Bohl*, 25 F.3d 904, 914 (9th Cir. 1994). The government's obligation, however, is not absolute. To obtain relief, a defendant must show that (1) the exculpatory value of the evidence was apparent before the government destroyed it; (2) the defendant "would be unable to obtain comparable evidence by other reasonably available means;" and (3) the government acted in bad faith. *Trombetta*, 467 U.S. at 489; *Arizona v. Youngblood*, 488 U.S. 51, 57–58. When the evidence in question is materially exculpatory – as opposed to potentially exculpatory – "the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Runningeagle v. Ryan*, 686 F.3d 758, 769–770 (9th Cir. 2012).

///

///

**IV.**

**Discussion**

Mr. Minor identifies three groups of evidence that are relevant to his motion: (1) the deleted October 23, 2021 phone call; (2) all of the deleted calls between October 19, 2021 and November 20, 2021, and (3) twenty deleted phone calls logged on the SIS spreadsheet. (ECF No. 43 at 9–11.) Defense counsel clarified at the hearing that the third group of calls refers only to those that Officer Perez identified as corresponding to the 214-308-2990 phone number, and that the second group refers to all calls – corresponding to any phone number – that Mr. Minor and Ms. Morrison made between October 19, 2021 and November 20, 2021. Defense counsel estimates that the latter group contains 68 unrecorded phone calls. (*See* ECF No. 43 at 10 (estimating a total of 88 phone calls between the second and third groups).) Counsel bases this conclusion solely on an estimate of the average number of calls per day Mr. Minor and Ms. Morrison made during the course of the alleged conspiracy.[2] (*See id.*)

**A.     All of the evidence is potentially – rather than materially – exculpatory.**

Determining the exculpatory value of the evidence at issue is a necessary threshold inquiry because it dictates whether Officer Perez's good or bad faith is relevant to the Court's analysis. It is particularly appropriate here because the government appears to have conceded the first two steps of the *Trombetta/Youngblood* analysis, arguing only that Officer Perez's failure to record the calls was not in bad faith. (ECF No. 53 at 5–6.) For Mr. Minor's part, he initially refers to all of the evidence as "potentially useful." (ECF No. 43 at 9.) In his reply, however, he claims that the October 23, 2021 call is materially exculpatory, rendering Officer Perez's good or bad faith irrelevant. (*See* ECF No. 56 at 2.) Specifically, he states:

> First, on that phone call Mr. Minor and Ms. Morrison spoke about a package that should 'be there Monday' or October 25, 2021. However, discovery related to the shipping company reveals that the package which SIS inspected, on October 26, containing the suspected THC, had arrived, on October 23, 2021. In other words, the October 23 phone call would have been exculpatory because it would have demonstrated that Mrs. Morrison and Mr. Minor were not talking about the package containing the suspected THC.

---

[2] The Court doubts that Mr. Minor has presented even a prima facie case that these 68 calls exist, much less that Officer Perez knew of their existence.

4

(*Id.*)  Mr. Minor contends that the package discussed on the October 23 call must have been different from the one that arrived that same day because "USPS gives a person the ability to determine whether a package has arrived or is en route."  (*Id.*)  Mr. Minor's counsel reiterated at the hearing his belief that the October 23, 2021 call was materially exculpatory.

Mr. Minor's argument that the content of this call is determinative of his innocence proves too much.  In fact, much of his argument hinges on the assumption that Ms. Morrison had up-to-date knowledge about the package's tracking information while she was on the phone with Mr. Minor.  The Court does not, however, have information about what time of day – before or after the phone call took place – the package arrived at USP-Atwater on October 23.  Nor does the Court have information about how long it takes USPS to update its tracking information.  Finally, the Court lacks information about the last time Ms. Morrison tracked the package – her statement about its delivery date may have been simply an estimate that a USPS employee provided at the time she put the package in the mail.  In short, the package could have arrived early at USP-Atwater without the knowledge of either Ms. Morrison or Mr. Minor.  It is far from definitive that the timing of the delivery and the content of the call require an inference that Mr. Minor and Ms. Morrison were discussing a different package.  The Court cannot find, therefore, that the content of the call is anything more than potentially exculpatory.[3]

The parties appear to agree that the remaining evidence is potentially exculpatory.  Specifically, Mr. Minor argues that recordings of all of the missing calls would have provided context for his communications with Ms. Morrison, which frequently involved innocent discussions of her clothing business.  (*Id.*)  Mr. Minor asserts that, for instance, he and Ms. Morrison used the term "old girl" on numerous occasions and in different contexts, indicating that the term did not have a specific coded meaning.  (*Id.* at 10.)  In fact, he points to other preserved phone calls where he and Ms. Morrison use the term "old girl" in non-incriminatory contexts.

---

[3] While the government has conceded the first two *Trombetta/Youngblood* elements, the Court notes that Mr. Minor's argument regarding the materiality of the October 23 call likely fails the second step of that test – the inability to obtain comparable evidence.  Mr. Minor argues that the call's materiality derives from the fact that it creates an exculpatory timeline.  If that is the case, it is difficult to understand why Officer Perez's notes do not constitute comparable evidence.  Those notes provide the exact same information about the timeline – when Mr. Minor and Ms. Morrison thought the package would arrive – as the actual conversation.

5

(*Id.*)  By failing to preserve these calls, Mr. Minor argues that he is unable to "show the jury that he engaged in a pattern of conduct that is manifestly exculpatory." (*Id.* at 10–11.)

**B.     Officer Perez's negligence in failing to preserve the phone calls does not rise to the level of bad faith.**

Mr. Minor correctly points out that the bad faith requirement "dovetails" with the first *Trombetta/Youngblood* element – knowledge of the exculpatory value of the evidence in question. (ECF No. 43 at 12 (citing *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015).) His analysis, however, goes one step too far, arguing that failure to preserve evidence with prior knowledge of its exculpatory value necessarily constitutes bad faith. (ECF No. 43 at 12–14; ECF No. 56 at 3–5.) This cannot be the case. If it were, it would conflate the first and third elements of the *Trombetta/Youngblood* test, rendering the bad faith element superfluous.

Mr. Minor cites to *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015) to bolster his argument.  In that case, border agents pulled the defendant aside for a secondary inspection as she attempted to cross the border. *Id.* at 974–75. Almost immediately, the defendant told the officers that she had several packages of drugs taped to her body. *Id.* at 975. She had transported the drugs under duress, fearful that, if she did not, men connected with a Mexican drug cartel would harm her and her family. *See id.* at 976. She had not alerted officers earlier because a handler was standing with her in line. *Id.* at 979. Nevertheless, she stated that she had waved her arms and made loud noises while in line to attract the attention of officers. *Id.* She had also been in line earlier in the day, but her handlers had pulled her out after she attempted to remove the packages of drugs from her body. *Id.* at 975–76. Even though Customs and Border Protection had a surveillance camera recording the line, the government was unable to produce any footage because the system automatically deleted stored footage every month. *Id.* at 977.

The Court of Appeals held that the interviewing officer knew that the video footage was potentially exculpatory because the defendant, throughout the interview, told the officer that she had conspicuously attempted to alert authorities to her presence in line. *Id.* at 979. Additionally, the officer asked the defendant several times about the handler who was with her in line, indicating that she knew the information was consequential to the investigation. *Id.* Finally, the

interviewing officer's bad faith was apparent: she knew of her obligation to collect both exculpatory and inculpatory evidence, she understood that duress could be a defense to a drug trafficking charge, and she had the ability to review and preserve the surveillance video. *Id.* at 980. In light of this, her failure even to watch the footage was indicative of bad faith. *Id.* This conclusion was buttressed by the fact that the officer's reports contained "glaring omissions in light of the statements [the defendant] repeatedly made." *Id.*

   Mr. Minor's case is distinguishable. First, unlike the officer in *Zaragoz-Moreira*, Officer Perez did listen to the evidence at issue and took notes. Mr. Minor asserts that Officer Perez's account of the calls would be biased, but there is no indication that Officer Perez's notes are misleading or contain fabrications. Moreover, Mr. Minor does not allege that Officer Perez's notes contain the same "glaring omissions" that the Court of Appeals found objectionable in *Zaragoza-Moreira*. Second, the urgency and volume of the evidence in this case differs from that in *Zaragoza-Moreira*. There, the officer spoke directly with the defendant, who revealed the significance of one or two video recordings. If the video recordings corroborated the defendant's statements, they would have definitively supported a duress defense. Officer Perez, on the other hand, reviewed hundreds of phone calls and never spoke directly with Mr. Minor. Additionally, Mr. Minor argues that the content of the unpreserved calls would have shown him talking about Ms. Morrison's clothing business. Such conversations would not have provided the same kind of concrete and apparent defense as the videos in *Zaragoza-Moreira*. Finally, Officer Perez preserved 183 other phone calls during his investigation, indicating that he was aware of his constitutional duties and supporting an inference that his failure to record certain calls was a product of negligence rather than bad faith.

///
///
///
///
///
///

7

Proving bad faith requires something more than a showing of an officer's knowledge of the potentially exculpatory value of a piece of evidence and a demonstration of the officer's negligence. Mr. Minor has failed to make that showing. Accordingly, the motion to dismiss is denied.

IT IS SO ORDERED.

Dated:   January 13, 2023

UNITED STATES DISTRICT JUDGE